In re **MORRISON INDUSTRIES, L.P., DIP, Debtor.**

**MORRISON INDUSTRIES, L.P., Plaintiff,**

v.

**HIROSS, INC., Defendant.**

**Bankruptcy No. 93–12075 K.**
**Adv. No. 93–1196 K.**

United States Bankruptcy Court, W.D. New York.

Nov. 10, 1994.

Jack L. Getman, Goldman, Costa, Getman & Biryla, Buffalo, NY, for debtor/plaintiff.

Raymond L. Fink, Saperston & Day, P.C., Buffalo, NY, for defendant.

**6**

*DECISION AFTER TRIAL*

MICHAEL J. KAPLAN, Chief Judge.

This Adversary Proceeding arises under 11 U.S.C. §§ 542 and 546(c) and involves the business relationship between the Debtor and Hiross Industries. Although the two companies occupied the same building when Morrison commenced this voluntary Chapter 11 case, they only had two official affiliations. First, Morrison leased space from Hiross, which it used as its storage and office facility. Second, pursuant to a "Requirements Contract," Hiross manufactured truck bodies and tool boxes for Morrison, who then sold these items to its own customers. Morrison and Hiross had no other relationship, such as shared employees or common ownership.

Over $100,000 worth of completed truck bodies was being kept on storage racks when Morrison filed its Chapter 11 case. At that time, Morrison owed Hiross approximately $190,000, most of which was attributable to invoices other than those underlying the stored products.[1]

Since the filing, Hiross has refused to obey the Debtor's instructions for shipment, claiming that because it has yet to "deliver" the product, it may assert its right under U.C.C. § 2–702(1) to refuse further delivery unless the full $190,000 is paid.[2] Section 2–702(1) provides, "Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under this Article." Since Hiross's ten-day right of reclamation under § 2–702(2) was not timely exercised, the only issue before the Court is whether Hiross has already "delivered" the products in question. If it has, then it is too late for Hiross to claim that it was refusing to deliver those products pursuant to § 2–702(1), and the goods are Morrison's, leaving Hiross with only an unsecured claim for goods sold and delivered on credit.

By a probably unique set of circumstances, and clearly no contrivances, the Court is presented with a very narrow issue of "first impression." It is also likely one of "final impression," for the facts are likely never to be duplicated. The Court finds that the products were not "delivered," and that their proceeds may be applied to what Morrison owed Hiross on the date Morrison filed its Chapter 11 petition.

*FACTS*

At the time that Morrison and Hiross entered into the Requirements Contract, Morrison occupied its own distinct premises located some distance from Hiross. Morrison, which was then a manufacturer of these products, sought to "outsource" the manufacturing process in order to reduce its size and become a mere pass-through to its customers. As part of its restructuring, Morrison was trying to re-locate its office and storage space.

Because Morrison was only going to be a pass-through organization, the contract with Hiross only contemplated that Morrison would want the product either shipped directly to its customers, or held by Hiross subject to Morrison's future shipping instructions. Consequently, the agreement stated that: "Transfer of the equipment from the Seller to a common carrier or a licensed public trucker shall constitute delivery. Upon such delivery, title shall pass to the Buyer, subject to the Seller's right of stoppage in transit." (Hiross, Inc. Terms and Conditions of Sale for Products Installed in the United States of America para. 5.) There is no doubt that at the time of contracting, the parties did not consider the possibility that goods might ever be delivered to or picked-up by Morrison itself. Morrison intended to have no trucks or equipment to move the goods, or any space in which to store the larger units.

---

1. In fact, some 60% of the stored product had been fully paid for. But the parties were operating under a blanket agreement which contemplated as much as $250,000 in outstanding credit to Morrison. It appears that the parties view the dozens of separate orders as part of a single "contract" for purposes of U.C.C. § 2–702(1), as described herein. *See* N.Y.U.C.C.Law § 2–702(1) (McKinney 1994).

2. In fact, the products have recently been sold and the proceeds put in escrow pursuant to a stipulation that, by its terms, would not prejudice the parties' respective arguments.

Soon after entering into the contract with Hiross, Morrison's negotiations for new space elsewhere collapsed, and it agreed to lease space from Hiross, although that agreement was never reduced to writing. Morrison paid $1,300 per month for a small amount of office space and some distinct inside storage space within the much larger Hiross facility. The outside space is a subject of dispute: An officer and director testified that Morrison believed it was renting use of some outdoor space, while the president of Hiross testified that this outdoor storage was only an "accommodation." In any event, no specific outdoor space was ever delineated in anything other than a course of conduct described below.

The products in question are those that were stored outside in this disputed area. Because the lease did not address the matter, the Court must examine the process by which the goods came to be placed there in order to determine whether there was "delivery" for purposes of § 2–702(1).

During the normal course of their business relationship, Morrison would send a purchase order to Hiross specifying the quantity and model of truck bodies that Hiross should produce. Upon receiving a purchase order, Hiross would send Morrison an "Order Acknowledgment" to confirm that they understood the order correctly and that the proposed price was acceptable before they began manufacturing. A Morrison employee would then check the Order of Acknowledgement and, if it was satisfactory, initial it as "O.K." and return it to the Hiross employee for Hiross's files.

As the manufacturing progressed, Hiross would send a "Pick Ticket" to Morrison notifying it that certain truck bodies were ready. A Morrison employee would then walk to the Hiross·production area to inspect the product for compliance and quality. If the truck body passed inspection, the Morrison employee would then write the shipping instructions on the Pick Ticket and sign it. The shipping instructions might read "shipped," designating that the product should be sent to one of Morrison's customers, or "stock," indicating that the truck body should be stored on the rack outside, pending further instructions. Hiross would issue an invoice for the product after it passed inspection, even if it was not yet to be shipped. Morrison paid for many of the truck bodies that were not yet shipped (*see* footnote 1).

If a truck body was to be shipped, Morrison would provide the Bill of Lading and other documents to Hiross, and a Morrison employee would participate in locating the right unit, moving others if necessary, and loading it, although it was a Hiross employee and forklift that did the actual moving. It is notable that when Morrison proposed rearranging the storage racks to facilitate shipment, Hiross accepted (what Hiross's CEO cleverly described at trial as) the "suggestion." (He was careful not to use any terms that might suggest dominion by Morrison over that space, over Hiross's employees or over the goods in question.)

## DISCUSSION

Were the truck bodies on the outside storage rack "delivered" to Morrison? The underlying import of that question is whether Morrison or Hiross, along with their respective creditors,[3] should receive the benefit of the fact that delivery terms that had been agreed upon when the parties were located in distinct facilities were rendered ambiguous, if not nonsensical, once they shared the same space. If Hiross prevails, it will take the proceeds of the products and apply them to Morrison's account. Hiross will then be an unsecured creditor of Morrison to the extent of all rents and invoices remaining unpaid. If Morrison prevails, it will use the proceeds in its Chapter 11 reorganization, and increase by that amount the total debt it owes Hiross as a prepetition unsecured creditor.

■ The conflicting considerations are significant. The Uniform Commercial Code advises that, "The remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as

---

**3.** Hiross itself came under new ownership, changed its name, and filed Chapter 11 soon after this Adversary Proceeding was filed. It has since emerged with a confirmed Plan of Reorganization.

good a position as if the other party had fully performed." U.C.C. § 1–106(1). Section 2–702 is intended to provide a remedy to sellers who are dealing with insolvent buyers. This suggests, in this instance, that the U.C.C. should be "liberally administered" in favor of Hiross.

However, there is also a strong policy of promoting the smooth flow of commerce (*see* U.C.C. § 1–102(2)) which suggests that in every sale of goods there should be a point in time at which the buyer may feel certain that it may re-sell the goods without fear of interference by the seller. We know that once goods have been "delivered," that moment is reached ten days later. U.C.C. § 2–702(2). At least where Morrison had already paid for the goods, it seems unsettling that Morrison and its customers should be denied such assurance here and left subject to Hiross's grace about whether they would ship or not until the goods were actually placed upon a common carrier.

The fact that § 2–702 must be liberally applied in favor of Hiross does not require that the parties' contract, which defines the term "delivery," be so construed. Although the agreement only specifically addresses one possible form of delivery, it would strain common sense to preclude other methods of delivery, such as by Morrison picking up the goods itself. The question that remains to be answered, then, is when delivery should be deemed to occur in transactions in which the goods are not placed on a common carrier.

■ For the answer, we must look to § 2–705, which addresses a "Seller's Stoppage of Delivery in Transit or Otherwise." As here, where there is no bailee, it is § 2–705(2)(a) that applies. That subsection permits a seller aggrieved under § 2–702(1) to "stop delivery until ... receipt of the goods by the buyer." "Receipt" is defined at § 2–103(1)(c) as "taking physical possession." Liberally applying the U.C.C. in favor of Hiross, it seems to the Court that Morrison never took physical possession of the goods in question. Official Comment 2 to § 2–705 bolsters that conclusion, recognizing that a buyer has received the goods when shipment is made

directly to the buyer's "subpurchaser," and the buyer itself never receives the goods:

> [T]he seller, by making such direct shipment to the sub-purchaser, [must] be regarded as acquiescing in the latter's purchase and as [sic] thus barred from stoppage of the goods as against him.

> As between the buyer and the seller, the latter's right to stop the goods at any time until they reach the place of final delivery is recognized by this section.

The storage area was not clearly under Morrison's control. Morrison had no means to move the goods. There is no evidence that Morrison's possession was inconsistent with Hiross's "right to stop the goods at any time until they reach the place of final delivery." The Court, therefore, finds that there was no "receipt" and consequently no "delivery."

■ However, that does not end the inquiry, for Morrison ably argues that the § 2–702(1) right to withhold delivery is a right that must be actively asserted at the time that the seller decides to withhold delivery except for cash. That is, a seller must use the § 2–702(1) right offensively, not as a defense in a later suit for non-delivery. This gives the buyer a chance to cover the goods. If the seller does not tell the buyer that he is invoking § 2–702(1), the buyer cannot sensibly react to that change in circumstances.

It appears to be undisputed that at no time prior to service of the Complaint in this action—a "turn-over" complaint by a debtor in possession under 11 U.S.C. § 542—did Hiross represent that it was asserting a U.C.C. § 2–702(1) remedy. Hiross seems to assert the "remedy" in the manner of a lien—a right that exists independent of any action or inaction on its part, assertable as a defense whenever Morrison demands possession. Morrison suggests that Hiross has some obligation to notify Morrison of its exercise of its "remedy," rather than to lie back and assert it like a lien, after the damage is done.

The answer to whether Hiross has a time limit on asserting its right to stop delivery must not be dependent upon the filing of the Chapter 11 petition. 11 U.S.C. § 546(c)

leaves intact the seller's state law right to reclaim goods in the buyer's bankruptcy.[4]

Thus, the question is what would have happened had the petition not been filed and Hiross asserted its § 2–702(1) remedy in the ordinary course of business. The Court is of the view that Hiross would have asserted its § 2–702(1) rights in the same fashion it did. Morrison would have asked Hiross to ship some truck bodies to one of its customers, and Hiross would have refused, invoking its § 2–702(1) right to refuse delivery. The fact that Morrison's Chapter 11 filing gave it a § 542 cause of action does not convert ordinary, reasonable conduct by Hiross into something less favored under the statutes.

Returning to the question asked above, the Court finds that the U.C.C. favors the seller rather than the flow of commerce, *when the purchaser is insolvent.* Had Morrison been solvent, Hiross would have had no right to *withhold delivery, even if Morrison was past due on payment.* Morrison would have been free to re-sell the product without fear of interference by Hiross. Here, where the Chapter 11 filing gave Hiross good reason to believe Morrison insolvent, Morrison had no right to re-sell clear of Hiross interference until 10 days after Morrison had "physical possession" of the goods. Morrison has not proven that it had "physical possession" by a preponderance of the evidence, and liberal application of the § 2–702(1) remedy in Hiross's favor is required.

It is SO ORDERED. The Complaint is dismissed on the merits.

---

4. Section 546(c) uses the word "reclaim." As a technical matter, U.C.C. § 2–702(1) is not reclamation, but a stoppage of delivery. Reclamation only becomes necessary once the goods have already been delivered. Some have argued, based on that fact, that § 546(c) does not preserve the seller's right to stop delivery to the Debtor. This argument has been rejected, however. *See In re National Sugar Refining Co.*, 27 B.R. 565 (S.D.N.Y.1983). The *National Sugar* court correctly pointed out the flaw in that argument, stating that it would:

> result in the anomaly of placing an unpaid seller who had withheld from the buyer constructive possession of the goods in a worse

condition than one who has transferred such possession to the buyer, and would suggest that [the seller in this case] should have engaged in the rather absurd behavior of proceeding to deliver the goods to appellant and immediately thereafter issuing a written demand for reclamation pursuant to Code § 546(c).

*National Sugar*, 27 B.R. at 571.

Such logic, and the clear parallelism of U.C.C. §§ 2–702 and 705, command a broad, non-literal interpretation of the word "reclaim"—one which includes a refusal to deliver and stoppage in transit.